[No. 1724-2.    Division Two.    June 17, 1976.]

BEVERLY M. PORTER, *Appellant*, v. JO ANN MACLEOD, *Respondent*.

*John S. Lynch* (of *Lynch & Lynch*), for appellant.

*Clifford L. Stilz, Jr.* (of *Fristoe, Taylor & Schultz, Ltd. P.S.*), for respondent.

PETRIE, C.J.—Plaintiff, Beverly M. Porter, appeals from a judgment declaring that she "has no ownership interest in or control over" a certain life insurance policy issued upon the life of her husband, Lynn A. Porter, several years before she and Lynn were married. The judgment also declares that she does not

have any right or interest in any dividends paid in

connection with said policy or cash surrender values accrued thereon or proceeds which may, in the future, be payable under the provisions thereof.

We affirm the judgment.

The policy was issued upon Lynn's life by Provident Life Insurance Company on October 27, 1969, when he was married to Jo Ann MacLeod, then Jo Ann Porter. Lynn and Jo Ann were divorced in 1970. He and Beverly were married in 1972, and thereafter all premiums have been paid from community funds of their marriage, but the record does not reflect the source of those funds. For reasons set forth below, however, the precise nature of the community funds used to pay premiums is not deemed to be critical.

Essentially, the policy requires payment of premiums in the approximate amount of $66 per month for 20 years with a right to participate in company dividends. Additional benefits provided by the policy are not material to this decision.[1] The policy designates Jo Ann as the owner and Paul Porter, minor child of Lynn and Jo Ann, as the primary beneficiary.

A "Child Custody-Property Settlement Agreement" incorporated into the 1970 divorce decree awards the policy to Jo Ann, requires Lynn to pay all premiums on the policy, and prohibits Jo Ann from changing the beneficiary. In 1970, the policy had no cash surrender value, and no dividends had accrued thereunder. Thereafter, the policy did develop a cash surrender value, and dividends which subsequently accrued have been "accumulative" in accordance with the policy application signed by Lynn and Jo Ann in 1969. In 1973, Lynn and Jo Ann stipulated that any money payable "upon the maturity" of the policy, irrespective of Lynn's death, shall be Paul's property.

Beverly asserts an ownership interest in the policy to the

---

[1] We are not told, for example, what portion of the monthly premium is required to pay for decreasing term insurance benefits. Beverly makes no claim to control nor to become a co-owner/beneficiary of that portion of the policy, recognizing that it is really a child support provision, and community personalty, at least, can be reached to pay those premiums. *Fisch v. Marler,* 1 Wn.2d 698, 97 P.2d 147 (1939).

extent community funds have contributed to the policy's value since 1972, and she seeks, minimally, a declaratory judgment permitting her to exercise the policy option which provides that dividends may be applied to reduce premium payments. Additionally, she seeks a declaration of her right to exercise sufficient ownership control to prevent Jo Ann from unilaterally destroying or reducing the value of the policy.

We note, initially, that there has been no attempt by Jo Ann to destroy or reduce the value of the policy.[2] Thus, there are no mature seeds of an actual, present, and existing dispute between the parties. Accordingly, we find no justiciable controversy as to that portion of Beverly's request for declaratory relief. *Diversified Indus. Dev. Corp. v. Ripley*, 82 Wn.2d 811, 514 P.2d 137 (1973). We do find, however, a justiciable controversy which warrants our determination of the extent of Beverly's ownership interest in the policy. As to that request there is an actual and present dispute between the two parties asserting substantial and opposing interests, a judicial determination of which will be final and conclusive. *Diversified Indus. Dev. Corp. v. Ripley, supra.*

We note, additionally, that distribution of the right of ownership of the policy and the responsibility for payment of premiums under the 1970 decree of divorce constituted a division of property. *Lynch v. Lynch*, 67 Wn.2d 84, 406 P.2d 621 (1965). The fact that the property had no immediate financial value in 1970 does not alter the nature and effect of the decree. We do not, however, view this present case as a collateral attack on that decree. Our concern, rather, is with the ownership of the enhanced value of the policy subsequent to 1972 to the extent that premiums were paid out of community funds.

We start with the fundamental concept that the decree of divorce completely divested Lynn of any right of ownership in or control over the policy. *United Benefit Life Ins.*

---

[2]After notice of appeal was filed, Jo Ann MacLeod died, and her personal representative has been substituted as the party defendant.

*Co. v. Price*, 46 Wn.2d 587, 283 P.2d 119 (1955). Specifically, he lost and Jo Ann acquired the contractual right to maintain the policy in force upon payment of the periodic premiums. Nevertheless, he was burdened with a continuing decretal obligation to pay the periodically recurring premiums on that policy as long as the owner deemed it necessary to maintain the policy in force. Thus, to a limited extent, Lynn entered the marriage in 1972 as an "encumbered spouse." *See* H. Cross, *The Community Property Law in Washington*, 49 Wash. L. Rev. 729, 830 *et seq.* (1974).

In support of her contention that she may pursue her community interest into whatever insurance asset was purchased with it, Beverly directs our attention to a long series of insurance cases, beginning with *Occidental Life Ins. Co. v. Powers*, 192 Wash. 475, 74 P.2d 27, 114 A.L.R. 531 (1937) and extending through *Chase v. Chase*, 74 Wn.2d 253, 444 P.2d 145 (1968) and *Livingston v. Shelton*, 85 Wn.2d 615, 537 P.2d 774 (1975), which restrict the husband, as a manager of the community estate, from depriving his wife of a right to an accumulating and proportionate interest in life insurance policies by paying premiums thereon with community assets.[3]

Typical language used in reiterating the *Occidental Life* rule is contained in *Small v. Bartyzel*, 27 Wn.2d 176, 180, 177 P.2d 391 (1947):

> After a second marriage, Mr. Small earned the sums of money which were used to pay the premiums on the insurance policy. That money belonged to the community consisting of himself and Katherine G. Small. It follows that the insurance paid for by community funds was the property of the community, and that Mrs. Small was entitled to recover that property as an asset of her deceased husband's estate.

Taken out of context, statements similar to the *Small* quotation can lead to an erroneous conclusion. Those pronouncements serve as guides toward answering the ques-

---

[3]For a critical and stimulating analysis of the "apportionment rule" *see Community and Separate Property Interests in Life Insurance Proceeds: A Fresh Look,* 51 Wash. L. Rev. 351 (1976).

tion: "What did the premium payer *purchase* with each payment?" In the case at bench, Lynn did not *purchase* anything; he fulfilled an obligation which he was compelled to fulfill by reason of the divorce decree. The insurer could not compel him to maintain the policy in force by continuing the premium payments, but Jo Ann could compel the continued premium payments by her insistence that the policy remain in force.

The community funds were most certainly converted into an increasingly valuable asset, but they were *compelled* payments, not *voluntary* payments. Insofar as Lynn may have paid premiums from *his* earnings after marriage, Beverly had no traceable interest, because the funds were used to pay an antenuptial debt which her husband brought into the marriage. RCW 26.16.200.[4] Insofar as Lynn paid premiums from community funds not ordinarily reachable by an antenuptial creditor through compulsory process, there is an arguable question whether Beverly could raise the traceable issue. For purposes of this opinion we will assume that the premiums were paid from community funds which Jo Ann could not ordinarily reach through compulsory process,[5] *i.e.*, Beverly's "earnings and accumulations."

We are impressed with the synthesized rule of law sug-

---

[4]RCW 26.16.200, as last amended in 1969, provides:

"Neither husband or wife is liable for the debts or liabilities of the other incurred before marriage, nor for the separate debts of each other, nor is the rent or income of the separate property of either liable for the separate debts of the other: *Provided,* That the earnings and accumulations of the husband shall be available to the legal process of creditors for the satisfaction of debts incurred by him prior to marriage, and the earnings and accumulations of the wife shall be available to the legal process of creditors for the satisfaction of debts incurred by her prior to marriage. For the purpose of this section neither the husband nor the wife shall be construed to have any interest in the earnings of the other: *Provided further,* That no separate debt may be the basis of a claim against the earnings and accumulations of either a husband or wife unless the same is reduced to judgment within three years of the marriage of the parties."

[5]An appropriate case will undoubtedly require reexamination of the rules of presumptions in community property law in the light of the 1969 amendments to RCW 26.16.200. We do not believe the case at bench is an appropriate case in which to enter that quagmire.

gested by Professor Cross in 49 Wash. L. Rev. 729, at 763 (1974):

A workable rule, then, is that an asset acquired through a transaction *requiring* the payment of installments over a period of time has the ownership character of the initial obligation and the "time of acquisition" is when the initial obligation is incurred, regardless of when title actually passed. By ascertaining the character of ownership on the basis of the character of the initial obligation, this rule would put the risk of subsequent fluctuation in value on the original obligor(s) who, presumably, contemplated that risk. In contrast, an asset preserved by or having its source in periodic payments which cannot be compelled (directly or indirectly) by the payee is owned in separate and community proportions according to the character of the funds used to make the "voluntary" payments.

Applying that rule to the factual situation presented herein, it is apparent that the "initial obligation" *requiring* payment was incurred upon entry of the decree of divorce, long before Lynn and Beverly were married. Hence, the *Occidental* "apportionment" rule does not apply, and the policy maintains its status as Jo Ann's separate property despite the fact that recent premium payments were made with community funds.

Judgment affirmed.

PEARSON and REED, JJ., concur.